We'll hear argument in Case 24-3661, International Partners For Ethical Care v. Inslee. Good morning. Good morning, Your Honors. I'm Gene Scher, representing the Plaintiff Appellants in this important parental rights case, and I'd like to reserve five minutes for rebuttal. The District Court's cursory opinion, issued just 24 hours after the case was assigned, illustrates the concern recently expressed by Justice Alito in dissenting, along with Justices Thomas and Kavanaugh, from denial of cert in the Eau Claire case. Namely, as he expressed it, quote, some federal courts are succumbing to the temptation to use the doctrine of Article III standing as a way of avoiding some particularly contentious constitutional questions. And in the process, I might add, misinterpreting the very Supreme Court decision on which the District Court here principally relied, which was Justice Alito's own majority opinion in the Clapper case. Now, in our time together, I'd like to do two things. First, I'd like to explain why the Washington statutory scheme here, which seeks to secretly influence children's actions on sensitive sex-related matters, changes the incentives faced by those children, and in the process harms parents and harms parents' interests. And then I'll explain, if I can, why the standing decisions of the U.S. Supreme Court and of this Court compel reversal given the specific allegations in the complaint, which, of course, must be taken as true. Now, there's an important principle governing our analysis of the Washington statutes at issue here, and that is the principle outlined in this Court's decision in the Maya case several years ago, which is that in assessing standing, the Court must assume that the legal claims are legitimate. And part of that, that principle also includes disagreements about interpretation of the statutes or the relevant regulations. If there's a dispute about that, the plaintiff's allegations about those interpretive matters also has to be accepted, and that was established in a decision several years ago called San Francisco v. Trump, a 2018 opinion written by Judge Thomas and then later quoted and cited in several other decisions of this Court. So with that important principle in mind, let's take a look at Washington's so-called Family Reconciliation Act. That scheme is part of a trend in some places in which government bodies or officials adopt measures, including hiding information from parents, that are designed to limit parents' ability to influence their children's views of and their actions with respect to sex-related matters. And obviously, when a governmental measure is designed to keep parents in the dark about some aspect of their child's education or development, the standing analysis has to take that into account. And here, there's no question that the scheme at issue here was designed to limit parental influence on the child's sex-related decisions. Senator Lease, for example, was one of the main sponsors of the legislation, and he acknowledged this. He said, what this bill speaks to is when a young person is seeking gender-affirming care in the face of opposition and hostility from their family, in those cases where the reunification process, that is, going back to their family after the child has run away, in those cases where that reunification process would separate that vulnerable young person from the health care that they're entitled to, that is, gender-affirming care, we need to ensure that they're getting the care that they deserve. And by the way, that's regardless of the parents' wishes and even in the face of the parents' wishes. So the legislation sought to accomplish that objective of excluding parents from those key decisions and in the process shifted the incentives of gender-incongruent kids in at least three ways. First of all, the legislation changed the requirements applicable to the Department of Children, Youth and Families, which I'll just refer to as the department. Before the amendments, the department could delay the return of a runaway child to her parents beyond 72 hours only if there were evidence of abuse or neglect. And the department had no authority to refer a minor for behavioral health services for gender confusion. They had no authority to do that at all. But now, under these amendments, without any advance notice to parents, the department is required to refer for those kinds of services any child who seeks gender transitioning. And I would invite you to look at the statutory appendix or addendum attached to our opening brief at page 77, which is the key provision there, subparagraph 3V, which makes clear that they're required to make that kind of a referral in that circumstance. It seems what was troubling the district court was with these particular plaintiffs, is there an imminency to being subjected or to encountering these laws that you're challenging? And how do you respond to that? I think they're fairly understood, the allegations in the complaint, which we can go over in detail if you like, but fairly understood. They do suggest an imminency in the sense that that term has been used in a lot of this court's decisions and in Supreme Court decisions, like in post-Clapper decisions, like the SBA list case in 2014 and others. They do suggest imminency in the sense that there is an immediate increase in the risk that those parents are going to lose influence over their kids. I would appreciate your response to why this isn't very much like Lujan. I understand the reason for your client's concern, but this is really speculative, really speculative. You can be worried about it, but under Lujan, there has to be more than just a speculation. This might happen. You've got to have people who have been affected by it, and that's what I'm struggling with. Where are the parents who have been adversely affected in a Lujanian sense because of the language of the statute? Well, and I'll answer that in just a second, Your Honor, but Lujan also recognizes a separate category of claims involving deprivation of procedural rights, as you'll recall. You wrote about this in a couple of earlier opinions of your own, and that is one set of allegations that our parents make. But if you look at the allegations in the paragraphs in our complaint that deal with the specific parents' concerns, all of them, virtually all of them, allege that they have children who are gender incongruent, who have actually, many of them, been subject to transition efforts at school and other places, and they allege, and reasonably so, that the effect of this statute is to change the incentives that their children face. What the statute essentially means is that if a child who is gender incongruent decides that they want to go through with a transition, all they have to do is run away from home. But counsel, with respect, I've got six kids of my own, so I have a little understanding about this kind of thing. You know, this statute, as I read it, doesn't say you have to parent in this way or you don't parent in this way. They provide certain extensions to previous law about what do you do with a runaway child, et cetera, et cetera. But I'm still struggling with how these individual plaintiffs have standing, notwithstanding Justice Alito's comment, in the way this statute is drafted. It provides a mechanism for people who are troubled, who want something in terms of care, but it doesn't say the parents can't teach the kids whatever they want, and it doesn't say they can't do whatever they want to, to the degree they can, to encourage them to not take certain steps. Would you agree with that? It's true that the statute does not directly regulate parenting, but it does have a significant impact on it. And so it's like a lot of other cases in this court and elsewhere where plaintiffs are facing an increased risk of something bad happening to them, in this case their parental rights being interfered with. This is where the Lujan issue comes in from my perspective. If this statute said as a parent you must do X, Y, and Z with respect to your child when there's a gender dysphobia, then you'd have a Lujan issue because it directly involves your parenting. Here what the statute seems to be saying is we're doing what we can to protect children as we view it. We're not telling you anything about what you have to do as a parent. And I don't see how that gets you to a Lujan sufficient basis for standing. Well, let me just give an example of a recent decision from this court called United States v. King County, an opinion written by Judge Bress a year or so ago. I think that was an analogous situation. A county executive had issued an executive order saying that if ICE comes calling and wants cooperation in using your airport facilities, you can't provide that. So that executive order had no direct impact on ICE or on the U.S. government. It didn't purport to regulate the U.S. government in any way, but it regulated other actors in a way that would have an impact on the U.S. government's interests. And so I think it's analogous to that, and there are a whole host of other decisions like that that involve a statute that regulates some third parties where there is a serious risk of an impact on the plaintiff. But again, and I respect your integrity and your clients, but again, what you're saying is they're worried. There's a risk. But in the eyes of the law, is it sufficient to show something real? As you know very well as an experienced lawyer, we get cases all the time of people who want to change a government policy of one kind or another. They have nothing to do with it, nothing at all. And they don't get anywhere because they're not directly affected. Now we're in this middle ground where you have somebody that their kids are obviously critically important to them, but there's no direct impact. It's worry. It's suspicion. It's concern about what it could lead to, but there's no direct control. I'm struggling with that. Help me out here. Well, let me give you another example, Your Honor. A few years ago, you wrote an opinion in a case called Krotner v. Starbucks, and that, as you'll recall, involved employees whose information was stored on laptop computers, and they were not directly regulated by anything in that case, but they were concerned about identity theft. Our employer hasn't been very careful with their electronics, and we're afraid that our identities are going to be stolen. And the court held that because the plaintiffs have alleged an act by the defendants that increased their risk of future harm, they have alleged an injury in fact sufficient to confer standing. And that's similar here. Again, and this increased risk is really just one of three different types of standing allegations that our clients have made. The first is the one I mentioned earlier, which is the deprivation of a procedural right, and here that procedural right is a parent's due process right to notice when the state interferes with the child-parent relationship. And the statute set up a system by which that's going to be allowed, because the statute expressly says if a runaway is reported to the department, they have to refer them for transition services without calling the parents, without, and there's no timetable, there's no requirement for contacting the parents, although there is in other situations where gender-affirming services are not at issue. So that's a distinct type of injury that was specifically carved out in Lujan, where the court there said this is sufficient to establish an injury in fact, and in fact there are some other decisions in this court. Well, another decision like that is the Spokio case in the Supreme Court from a couple of years ago. Recent decisions in this court are Witt v. United Behavioral Health Services and Judge Smith's opinion in NRDC v. Jewell, which relied on that exception in Lujan for situations where a procedural right is being abrogated. Now, we're likely to get some added guidance on the scope of this particular parental right from the Supreme Court's upcoming decision in Mahmoud v. Taylor, which, as the Court's aware, involves the schools reading controversial stories to kids without notice to parents. But in any event, decisions like Maya require the court in assessing standing to assume the validity of the underlying legal claims. And so if you follow that principle, I think it's clear that we easily fall within that exception to Lujan, on that very express exception for situations where people are being deprived of their procedural rights. The other type of injury that we haven't talked about yet are plaintiff's allegations that the statutes here in fact impose current concrete injuries on them in the form of chilled speech and other effects on their parenting today, analogous to those that were recognized in cases like this Court's decision in Presbyterian Church v. United States from 1989, which involved surveillance by the government that caused people to stop coming to church out of a fear of being surveilled. Again, a case where they were not being directly regulated, but the government did something to instill fear in them that affected their concrete actions. And here, given that plaintiff's children have already demonstrated a risk of running away, unlike the Clapper situation, it's not at all hypothetical that the plaintiffs would be immediately affected by these laws. Indeed, these are the very kids and the very parents that are targeted by the amended statute. And so specifically, plaintiffs 2A and 2B, for example, allege at paragraphs 28 and 29 of the complaint that they have self-censored their speech on gender matters for fear of provoking their child to run away and take advantage of these new provisions that allow any runaway to get gender-affirming care. Similarly, plaintiff 1A has declined to discipline her daughter for fear that it will cause the daughter to run away. And plaintiffs 5A and 5B allege that they are currently being denied access to their child's mental health records on gender identity issues. And so even if you don't accept the category of harms or increased risk of harms that we talked about earlier, there are still these two other categories of harms that we've alleged that are more than sufficient to confer standing. And so we've alleged multiple adequate bases for standing under controlling precedent of this Court. Unless the panel has other questions, I'll reserve the rest of my time. Okay, thank you. May it please the Court, Christina Sepe on behalf of the State, Appalese, Governor Ferguson, Attorney General Brown, and Secretary Sun. Plaintiffs primarily challenge a state law that directs the Department of Children, Youth, and Families to notify parents about runaway youth who are seeking gender-affirming care so that the Department has the opportunity to offer families reunification services and behavioral health service referrals. Plaintiffs disagree with the law, but that doesn't give them standing to upend it. They must show that the law causes actual or imminent injuries that are certainly impending, and they cannot. Instead, their amended complaint is littered with shoulds and ifs that underscore how attenuated their harm is. They contend the laws make it possible that their children may someday seek refuge with a licensed homeless shelter and obtain gender-affirming care without their consent based on DCYF referrals, but they do not allege facts to support the likelihood or timing of such actions. This Court should affirm dismissal. Counsel, may I ask you this? Your opposing counsel indicated that at least in, I think it was in the runaway situation, that there was no obligation on the part of the state's agency to notify the parents at all. My recollection was that within a certain number of hours, there was supposed to be notification. Is that correct, or is your opposing counsel's statement more correct? Judge Smith, your reading of the statute is correct. So if you look at Section 1332A.082, if a youth presents seeking refuge and there are compelling circumstances that shelter must then notify the Department of Children, Youth, and Families, who then must in turn under Section 3A, as soon as possible, but no later than three days, excluding weekends and holidays, follow up with families and youth about providing services. I think this is further underscored by the Department's own policies, which you can see at supplemental excerpts of Record 87 and 88, which require that a caseworker contact youth within 24 hours, and same with the Department's policy 3100 at supplemental excerpts of Record 91, which require caseworkers contact parents within 24 hours of being assigned the case, excluding holidays and weekends. And so it is required, caseworkers must, the Department must contact families. So if I can just take a step back again and underscore that this law does not prescribe the parents from doing or refrain from doing anything. What it does before and after is change who notifies parents, not whether they're notified at all. The Department is given the responsibility of notifying families, but that's so that they have the opportunity to offer additional services to youth and their families before youth disappear into the streets. The law, again, doesn't require the parents to do or refrain from doing anything. I understand that the plaintiffs have really deep ideological opposition to the law, but those disagreements are better directed to the ballot box and not this court. And I'd like to emphasize that this case begins and should end with standing. So first on injury and fact for the plaintiff parents, they fail to allege injuries that are concrete, particularized, actual, or imminent. And Clapper clearly rejects their theories of future and ongoing injuries. So on this attenuated chain of possibilities, the parents, in order to establish that they have injury, would need to allege that they have children who have a gender identity that's different from their sex assigned at birth, are seeking or receiving gender-affirming care, have run away from home and sought refuge at a licensed homeless shelter, declined to share parental information to receive reconciliation services, have accepted a DCYF referral for behavioral health services. And here that is, it may be substance abuse treatment or it may be mental health care treatment, and that they've obtained, the child has obtained gender-affirming care, including mental health care, from a provider without parental consent based on that referral. Probably in that circumstance, you're right, that the parents would have standing. I guess the question is, do they need to go that far? It seems that here they've overcome a few of the steps you mentioned, like they have children who are questioning their gender identity. There's some indication that some of the children either have run away or contemplated that, and maybe they have had, I don't know, gender-affirming care is probably too strong a word for what's happened, but they've had some exposure to some of that at school. So I think, I may not have that perfectly right, but that the plaintiffs are saying, well, we have that, so we're kind of fearful then that these laws will affect us. And why do you think that's not enough? A few responses, Your Honor. One, this is a regulation of third parties, not of the parents themselves. And so what the court, for example, in Alliance for Hypocratic Medicine has said, is that standing is substantially more difficult to establish in that situation. I think it also speaks to traceability issues where a lot of the decisions of third parties here, that is children, licensed shelters, medical care providers, are all actors who are making independent decisions from the parents, and that makes standing more difficult here, too. I agree that Plaintiffs 5A and 5B are probably the closest in this attenuated chain of possibilities, but if you look closely at their allegations, they never allege that a child has run away to a licensed shelter or would disclose that they're seeking protected health care services and consent to a referral and then receive gender-affirming care, and so that is still a really attenuated chain of possibility before establishing that their harm is imminent or certainly impending. And the plaintiffs don't address Clapper at all in their opening brief or their reply brief. They briefly mention it in their opening argument, but Clapper controls here. Their lawyers and nonprofit organizations were concerned with the federal government's electronic surveillance activities that would intercept their privileged or confidential communications with foreign clients, but they never alleged that their communications had been intercepted or would be in the near future, and so it was that gap that led the court to hold that the plaintiffs lacked standing because they failed to allege the facts showing that their threat and injury was certainly impending. And so following Clapper, cases like John and Jane Parents 1 in the Fourth Circuit, as counsel referred to the Parents Protecting Our Children case from the Seventh Circuit, which Justice Alito dissented from the denial of the petition of writ of certiorari, followed Clapper to agree that challenges to, for example, school district gender identity policies were too attenuated for those parents to bring challenges to them. The parents have argued that they have present and ongoing injuries as well, but their reactions to their fear of harm cannot be parlayed into the necessary injury for standing, and that theory is likewise rejected by Clapper. So some parents have alleged that they have changed their parenting styles and their speech, but these are self-imposed changes, and in Clapper, challenges there said that they suffered from present costs and burdens based on the fear of surveillance. They also alleged that they changed their speech for fear of surveillance, but the court explained that that theory of harm couldn't manufacture standing because the plaintiffs there were inflicting the harms on themselves based on their fears of the hypothetical harm. That wasn't certainly impending. Similarly, this court in Twitter has talked about when actions are taken voluntarily that that's not sufficient to establish Article III standing. The parent plaintiffs, as I mentioned before, also lack standing because of traceability issues, and Judge Thomas, I'd like to point to your decision in the intervention case in Washington v. FDA, which stated that you can't rely on the speculation about the unaffected choices of independent third parties in establishing standing. Judge Bress, your opinion in King County looked at whether or not there was a substantial motivating factor that would motivate third parties' actions, and there we knew that ICE was directing flights out of Boeing Airfield. Third parties did react in response to the executive order that had been imposed by King County, and that's why there was standing there. There are other standing theories that the plaintiffs have alleged to try and avoid Clapper's controlling precedent. So, one, that there is an increased credible fear of harm, and here a counsel has referenced, Judge Smith, your opinion in Krotner, that dealt with the theft of an unencrypted laptop that then increased the risk of identity theft. But you had written that that threat wouldn't be credible if the laptop had only been alleged to be stolen at some point in the future, but here the laptop was actually stolen. And so there is still that speculative multi-chain link that plaintiffs are alleging here that would then parlay into the harm that they're alleging. What the plaintiffs might respond to is to say, well, by the time, under your view of standing, by the time we would have standing, the harm would have already happened and we're trying to stop this before we're deprived of our parental rights. Understood, Your Honor. You know, precedent from the Supreme Court in this court has talked about injury that has actually occurred or is certainly impending to occur, and if that were the situation, if parents were alleging that they had a runaway youth and the DCYF wasn't sharing information with them or they feared other issues as a result of that youth running away, there are other vehicles for parents to come quickly into court, whether that be through a temporary restraining order or seeking an expedited PI against the department for its purportedly wrong actions. But here what we have is this attenuated chain of speculative harm of if the child were to run away, if they were to run away to a licensed shelter, if they were to seek referrals for gender-affirming care, etc., etc. So the real difference from your perspective is that in this case, you don't have any real live examples of people who are harmed, whereas in other cases, like in the Starbucks case, there was a policy against disclosing information. Somebody's computer was actually stolen. The company provided a service to try to help people to avoid the problem, whereas here it's speculative what will happen. If you had somebody that said, my child did X and he or she fell within the statute, then you have an entirely different standing issue, would you not? I agree, Judge Smith, that we'd be in a different boat. But as it stands right now, based off of the allegations made by the parent plaintiffs, specifically at ER 17 or 16 through 23, it is just that attenuated chain of possibilities that doesn't make their injuries actual or certainly impending. The plaintiffs have also tried to analogize their case to pre-enforcement standing cases where standing may be a little bit more relaxed, looking at whether or not there's a credible threat of enforcement against the challenger. But this is not a pre-enforcement standing case. There's nothing to be prosecuted against the parents. There's nothing that the parents are refrained or required to do under the statute. Again, it just changes the notification of licensed shelters to DCYF. There's nothing that the parents do or need to refrain from doing. So for all of the reasons that the parent plaintiffs lack standing here, the International Partners for Ethical Care also lack standing. They have no members who have standing to sue in their own right. They make no allegations about being able to pursue this case under organizational standing. That is, they have not alleged any real-world impediment to their activities. And so for all of these reasons, the plaintiffs lack standing in this case. Because the plaintiffs lack injury in fact, this case is also not constitutionally ripe. And this court could alternatively decide this case under prudential rightness as well. But we think that standing is the best ground for this court to affirm. The case is controlled by Clapper and other cases like it. And so if the court has no further questions, we ask that you affirm the district court's dismissal. Thank you. Just a few brief points in rebuttal. Judge Bress, I think your point earlier is exactly the right point and illustrates the problem here, which is that under the State's theory, by the time our clients have standing, the harm will likely already have occurred. And that's especially important, and that is the key problem here, because the State is affirmatively trying to hide information from parents. So there's a double problem with their theory as a practical matter. Counsel, let me ask you this in reverse of what I asked your opponent. If you had a parent whose child had run away and the State had not followed the statute and so on, you'd clearly have standing there, would you not? Yes, and we do have a parent whose child has actually run away before the statute was passed. OK, so that kind of situation, you maybe have a better shot at standing. But otherwise, it's just we think this is what's going to happen. This is what we're worried about. We still have that same Lujan, if you will, speculation issue. Well, I think the Supreme Court's decisions after Lujan have added some additional clarity to what that requirement means. If you take the SBA list, for example, the court made clear that Clapper was not the only way to get standing, that you could get standing based on an increased risk of harm. But with respect, Counsel, my reading of the Supreme Court's standing cases shows an ongoing desire by the Supreme Court to limit access to the federal courts using standing. For example, the Biden versus Nebraska case. What am I missing? Well, there are certainly some limits to standing. But again, standing depends on the allegations of the complaint, which have to be accepted as true. And again, as I said earlier, where there's a disagreement about what a State law or what a Federal regulation or something else like that does, at this stage you have to accept the plaintiff's view of the matter. That's for standing purposes. I mean, the State may well have a decent 12b-6 argument when we get back to the district court based on the disagreement about what the statute does. But on that point, if I could, let me just respond to something that my colleague said. She said that she made a big deal of the fact that our plaintiffs never allege that they have a child who's actually run away to a licensed shelter. Well, that's really a red herring because the statute here doesn't just apply to licensed shelters. The obligations imposed on the department apply whether the child runs away to a licensed shelter or to the neighbor down the street or whatever. And the new law clearly says that if a child runs away and then the department gets a report about it and the child wants gender-affirming care, the department has to provide that. And, again, and with respect to the notice point, we probably don't want to take the time to parse the statute, but if you look closely at subsections 3b and 3a in the statute, it's apparent that, yes, the department is required to make a good-faith attempt to notify the parents, but the three-day requirement by the text of the statute only applies when in the usual situation where the child is not seeking gender-affirming care. And there's a separate subsection that deals with when a child is seeking gender-affirming care. I think that's subsection 3b. And there is no timetable at all on the department for notifying parents in that circumstance. They can do it under the statute. They can do it whenever they want. And, yes, you know, the agency has a rule that has a policy that says that a caseworker is supposed to contact parents within 24 hours of being assigned. But, again, there's no requirement on when the department assigns a caseworker. And, obviously, those policy guidelines are not binding. But, again, that's something that the state can raise on the merits if they want. We've let you go a little bit over your time, and I want to see if my colleagues have any further questions. I want to thank you very much, Mr. Scherer. Do you want to make a brief comment? If I could just have one sentence, Your Honor.  A government cannot pass a law designed to keep parents in the dark about the government's own efforts to influence their child's views and choices about important sexual issues, and then turn around and claim, with any credibility, that parents lack standing because they can't predict with complete certainty when and how those secret efforts are going to play out. And we urge the Court to reverse. Thank you. Thank you. Mr. Scherer, thank you. Ms. Sebi, thank you both for your arguments. This matter is submitted, and the Court will be adjourned until tomorrow morning. All rise.
judges: THOMAS, SMITH, BRESS